**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


CHARLES R. FRIDINGER,       )
                             )
             Plaintiff,    )
                             )
             v.           )          1:10CV906
                             )
STONEGATE WEALTH MANAGEMENT, LLC,  )
                             )
             Defendant.    )


**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

    This case comes before the undersigned United States Magistrate Judge on a Motion to Remand to the Superior Court of Guilford County (Docket Entry 13) by Plaintiff Charles R. Fridinger and a Motion to Dismiss or Transfer (Docket Entry 8) by Defendant Stonegate Wealth Management, LLC ("Stonegate"). For the reasons that follow, Fridinger's Motion to Remand is denied and Stonegate's Motion to Dismiss or Transfer should be granted as to the request for dismissal for lack of personal jurisdiction (thus mooting the alternative request for transfer).[1]

## I.  BACKGROUND

### A.  Factual Background

    The Complaint identifies Fridinger as a citizen of North Carolina. (Docket Entry 3 at 1 (¶ 1).) The parties agree that

---

[1] For the reasons stated in <u>William E. Smith Trucking, Inc. v. Rush Trucking Ctrs. of N.C., Inc.</u>, No. 1:11CV887, 2012 WL 214155, at *2-6 (M.D.N.C. Jan. 24, 2012) (unpublished), the undersigned Magistrate Judge will enter an order as to Fridinger's Motion to Remand; however, the undersigned Magistrate Judge must address Stonegate's Motion to Dismiss by way of recommendation, <u>see</u> 28 U.S.C. § 636(b)(1)(A) and (B).

Stonegate is a limited liability company organized under New Jersey law with its principal place of business in New Jersey. (Id. (¶ 2); Docket Entry 9 at 1 (¶ 4).) Evidence submitted by Stonegate reflects that it "provides investment management and financial planning advice to individuals, businesses, trusts, and corporate retirement plans" (Docket Entry 9 at 2 (¶ 6)) and that its members/ owners have never resided in North Carolina (id. at 1 (¶¶ 2-3)).

Thomas J. Geraghty, Jr., a Senior Wealth Manager for Stonegate (id. (¶ 2)), has averred that he met Fridinger in 1998 "when [they] both worked for another financial planning company in New Jersey. After [they] both left that company in the early 2000s (independently), [they] occasionally kept in touch over the telephone." (Id. at 2 (¶ 12).) According to Geraghty, in or around late 2008, "Fridinger pitched [Geraghty] a business model pursuant to which Fridinger would manage Stonegate's qualified plan division and solicit new clients for Stonegate throughout the northeastern United States." (Id. at 3 (¶ 14).)[2] Geraghty's affidavit asserts that he and Fridinger "discussed [Fridinger's] business model in telephone conversations while [Geraghty] was in Florida and New Jersey" and they met with "other Stonegate officers in Stonegate's offices in New Jersey regarding [Fridinger's] business model and proposed partnership with Stonegate." (Id.)[3]

---

[2] Fridinger has not contested Geraghty's statement that Fridinger reached out to Stonegate to initiate a business arrangement. (Docket Entry 12.)

[3] Fridinger has not disputed this account. (Docket Entry 12.)

The parties agree that they did not execute a written contract (Docket Entry 3 at 2-3 (¶ 5); Docket Entry 9 at 3 (¶ 15)),[4] but that they nonetheless commenced a working relationship of some sort, with Stonegate making monthly payments to Fridinger beginning in April 2009 (Docket Entry 3 at 1-3 (¶¶ 4-6); Docket Entry 9 at 4 (¶ 16)).[5] The Complaint alleges that the parties' (unwritten) agreement contemplated that Fridinger "would live and work in North Carolina, but would travel to an extent reasonably required by [Stonegate] and by the needs of his job." (Docket Entry 3 at 2 (¶ 4).) Geraghty's affidavit states: "Stonegate did not require Fridinger to work or live in any particular city, state, region, or country. . . . Stonegate did require Fridinger to travel to Stonegate's office in New Jersey as needed to meet with Stonegate personnel and clients. Fridinger traveled to New Jersey approximately once a month." (Docket Entry 9 at 4 (¶¶ 18-19).)

Geraghty further has averred that, "[o]n June 9, 2009, [he] traveled to North Carolina to meet with Fridinger for a few hours.

---

[4] The Complaint alleges that Stonegate provided Fridinger a draft written contract, but "it contained certain provisions to which the parties never agreed, and which were not acceptable to [Fridinger], including that New Jersey law would be the governing law of the contract and that New Jersey courts would be the exclusive jurisdiction for resolving all disputes under or related to the contract." (Docket Entry 3 at 2-3 (¶ 5).)

[5] According to the Complaint, the parties agreed that Fridinger "would become an independent contractor of [Stonegate] . . . [and] would be the managing partner of [Stonegate's] qualified plan department." (Docket Entry 3 at 1 (¶ 4).) Geraghty's affidavit concurs that Fridinger "work[ed] as an independent contractor for Stonegate" (Docket Entry 9 at 4 (¶ 21), but maintains that "Stonegate never offered for Fridinger to become a partner of Stonegate" (id. (¶ 17)).

Case 1:10-cv-00906-CCE-LPA   Document 27   Filed 08/05/13   Page 3 of 22

At this meeting, [Fridinger and Geraghty] agreed that Fridinger would concentrate efforts and resources on client development in New Jersey rather than the entire northeastern United States." (Id. (¶ 20).) According to Geraghty, during that visit, "Fridinger arranged an impromptu meeting with individuals associated with [two companies that operate in North Carolina]. [Geraghty] had not expected to meet with either company. Nothing came of the meeting, and neither became a client of Stonegate." (Docket Entry 21 at 2 (¶ 6).) In his own affidavit, Fridinger has affirmed that the foregoing meeting occurred, but has sworn that he and Geraghty agreed that Fridinger "would concentrate [his] efforts on client development in North Carolina." (Docket Entry 12 at 3 (¶ 8).)

The parties also agree that Stonegate ended its working relationship with Fridinger in early 2010, but disagree about the precise timing of and circumstances surrounding that event. (Docket Entry 3 at 3 (¶ 7); Docket Entry 9 at 5 (¶ 22).) More specifically, the Complaint alleges that, although Fridinger "well and truly performed his obligations under the [unwritten] contract with [Stonegate,] . . . [it] terminated [him] on April 4, 2010, without cause" (Docket Entry 3 at 3 (¶¶ 6-7)), whereas Geraghty has averred that he carried out Fridinger's firing in February 2010, following a discussion the two had about Fridinger's "poor performance" and Geraghty "learn[ing] that Fridinger had disregarded a direct instruction from [Geraghty] in meeting with a prospective client" (Docket Entry 9 at 5 (¶ 22)).

-4-

## B. Procedural Background

Fridinger commenced this action by filing the Complaint in the General Court of Justice, Superior Court Division, Guilford County, North Carolina. (Docket Entry 1 at 1; Docket Entry 3 at 1.) Stonegate removed the case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332 (Docket Entry 1 at 2) and then moved to dismiss the case under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction or, alternatively, to transfer the case to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1404(a). (Docket Entry 8.) Fridinger responded in opposition (Docket Entry 15) and Stonegate replied (Docket Entry 22). In addition, Fridinger moved to remand the case to state court (Docket Entry 13) and Stonegate responded in opposition (Docket Entry 23).

## II. DISCUSSION

### A. Fridinger's Motion to Remand

"A civil case commenced in state court may, as a general matter, be removed by the defendant to federal district court, if the case could have been brought there originally." Martin v. Franklin Capital Corp., 546 U.S. 132, 134 (2005) (citing 28 U.S.C. § 1441). "If it appears that the federal court lacks jurisdiction, however, 'the case shall be remanded.'" Id. (quoting 28 U.S.C. § 1447(c)). "The burden of demonstrating jurisdiction resides with the party seeking removal." Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 816 (4th Cir. 2004) (en banc) (internal quotation marks omitted). "[Federal] district courts shall have original

-5-

jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states . . . ." 28 U.S.C. § 1332(a). Fridinger's instant Motion to Remand seeks to return this case to state court "for the reason that this [C]ourt is without subject matter jurisdiction, since the amount in controversy is less than $75,000." (Docket Entry 13 at 1.)

"In most cases, the 'sum claimed by the plaintiff controls' the amount in controversy determination." JTH Tax, Inc. v. Frashier, 624 F.3d 635, 638 (4th Cir. 2010) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938)). Moreover, "[c]ourts generally determine the amount in controversy by reference to the plaintiff's complaint. If the complaint in good faith alleges a sufficient amount in controversy, events occurring subsequent to the filing of the complaint which reduce the amount recoverable below the statutory limit do not oust jurisdiction." Id. (internal brackets, citations, and quotation marks omitted).

Fridinger's Complaint alleges that the parties' unwritten agreement provided for the following compensation: (1) "[Fridinger] would be paid at the rate of a $4,000 guaranteed draw per month, not contingent on production, beginning with the month of April, 2009 and continuing throughout [his] employment"; (2) "[Fridinger] would receive as additional compensation 70% of all net revenue brought in the first year of his work, 60% of all net revenue brought in the second year of his work, and 50% of all

-6-

net revenue in each year thereafter"; and (3) "expenses for travel and customer entertainment." (Docket Entry 3 at 2 (¶ 4).) Further, according to the Complaint, the parties' unwritten agreement required that Fridinger "give up his own business of retirement plan consultant," "surrender his broker-dealer license," "no longer do any commission-based work," and "stop doing 401(k) enrollment meetings." (Id.) Moreover, the Complaint asserts that, in case of "termination," the parties' unwritten agreement provided that he "would receive 1.1% of assets under management in [Stonegate's] qualified plan department, including, without limitation, all 401(k) plans managed by [Stonegate]." (Id.)

The Complaint alleges that Stonegate "breached its agreement with [Fridinger] by "failing to pay [him] two months of draws at the rate of $4,000 each, for a total of $8,000 during the months of March and April, 2010; by failing to reimburse [him] for expenses in the amount of $1,100; and by failing to pay [him] the 1.1% value of assets under management, this percentage amounting at time of termination to $88,000." (Id. at 3 (¶ 8).) In addition to those damages, the Complaint asserts that Fridinger "also suffered reliance damages . . ., consisting of giving up his own book of business with a reasonable value of $30,000 before he began working for [Stonegate]; turning away business that was in the pipeline, but had not yet become part of [his] book of business, in the amount of $51,000 . . .; and losing $5,000, because of no longer being able to do 401(k) enrollment meetings with clients." (Id. (¶ 9).) Accordingly, as Stonegate observed in opposing Fridinger's

-7-

instant Motion to Remand, "the total amount of damages alleged in the Complaint – not including interest and costs – is $183,100." (Docket Entry 23 at 2.)

Fridinger never amended his Complaint to alter the foregoing allegations. (See Docket Entries dated Nov. 22, 2010, to present.) Instead, shortly before moving to remand, he filed an affidavit in which he averred, in pertinent part, as follows:

> 2. In reviewing the [C]omplaint, I have found that certain mistakes were made in calculating damages, and that certain other damages were set forth that are too speculative to be prudent.

> 3. In paragraph 8 of the [C]omplaint, an erroneous statement was made that I would be paid 1.1% of the value of the assets in my department, amounting to $88,000. The agreement I had with [Stonegate] actually was that I would receive 1.1 times the revenue generated from assets in my department. Conservatively, that revenue would have amounted to $55,000 per year. Therefore, I should have received the amount of $55,000, not $88,000 as stated in paragraph 8 of the [C]omplaint.

> 4. In reviewing the contents of paragraph 9, I now realize that it is entirely too speculative and uncertain to say that I would receive any damages from giving up my book of business and from turning away business that was in pipeline. I had estimated these losses to be $81,000 in the [C]omplaint, but I now realize that these amounts, nor any amounts for these alleged type of losses could be proved with reasonable certainty. I do believe I could prove with reasonable certainty that I lost $5,000 because of no longer being able to do 40l(k) enrollment meetings with clients.

> 5. To summarize, I believe that the maximum damages I can recover in this lawsuit are:

>> a. Failing to be paid for two months of draw at the rate of $4,000 each, for a total of $8,000;

>> b. Failing to be reimbursed for expenses in the amount of $1,100;

-8-

        c. Failing to be paid for 1.1 times annual revenue generated from assets in my department for a total of $55,000; and

        d. No longer being able to do 40l(k) enrollment meetings with clients for a total of $5,000.

        The foregoing maximum recoverable damages in the lawsuit amount to $69,100.

(Docket Entry 11 at 1-3.)

Additionally, three days after filing his instant Motion to Remand, Fridinger filed the following "Stipulation":

        NOW COMES, plaintiff in the above-entitled action, and hereby stipulates that he will not seek at trial or by means of any motion, to recover a verdict in excess of $75,000, in this case, but rather will limit his claims to a total of $69,100, and should a verdict be returned that is in excess of the amount plaintiff seeks, he will voluntarily submit to a remittitur to the sum of $69,100.

(Docket Entry 16 at 1.)

"As numerous cases make clear, when the amount in controversy claimed in the plaintiff's state court complaint exceeds $75,000, the complaint generally is determinative of the amount in controversy . . . ." 14C Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 3725.1 (4th ed. 2010); <u>accord</u> <u>JTH Tax</u>, 624 F.3d at 638. "[If] the plaintiff seeks remand to the state court on the ground that the requisite amount is not in controversy . . ., many courts require the plaintiff to demonstrate to a legal certainty or as a matter of law that, despite the allegations of the complaint, the amount recoverable by the plaintiff cannot exceed $75,000." Wright, <u>supra</u>. That requirement makes sense, <u>see</u> <u>St. Paul Mercury</u>, 303 U.S. at 294 ("The claim, whether well or ill founded in fact, fixes the right of the defendant to remove, and

the plaintiff ought not to be able to defeat that right and bring the cause back to the state court at his election."), and, as explained below, Fridinger has not satisfied it.

The undersigned Magistrate Judge will assume that Fridinger's above-quoted affidavit adequately shows that paragraph 8 of the Complaint contains an honest misstatement regarding the alleged agreement between Fridinger and Stonegate about a termination payment formula, such that, to a legal certainty and based on the facts and circumstances in existence and known to Fridinger at the time of the filing of the Complaint, Fridinger could have received a termination payment of only $55,000 (rather than $88,000). However, Fridinger's affidavit fails to show, either to a legal certainty or as a matter of law, that he could not have recovered the "reliance damages" of $81,000 for forgone business he claimed in paragraph 9 of the Complaint. As to that portion of his damages claim, Fridinger contends neither that the allegations on point in the Complaint represented some sort of scrivener's error or that he lacked a good-faith belief in the viability of such allegations at the time he made them. Instead, viewed in the light most favorable to Fridinger, his affidavit appears merely to offer a subsequent re-thinking of his likelihood of securing such damages.

In sum, because the record (even considering Fridinger's above-quoted affidavit) reflects that his "[C]omplaint in good faith allege[d] a sufficient amount in controversy, events occurring subsequent to the filing of the [C]omplaint [such as Fridinger's post-hoc assessment of the viability of certain of his

damage claims and his belated stipulation to forgo such damages] which reduce the amount recoverable below the statutory limit do not oust jurisdiction," JTH Tax, 624 F.3d at 638 (internal brackets, citations, and quotation marks omitted); see also St. Paul Mercury, 303 U.S. at 292 ("And though, as here, the plaintiff after removal, by stipulation, by affidavit, or by amendment of his pleadings, reduces the claim below the requisite amount, this does not deprive the district court of jurisdiction."); Porsche Cars N. Am., Inc. v. Porsche.net, 302 F.3d 248, 255-56 (4th Cir. 2002) ("[A] court determines the existence of diversity jurisdiction at the time the action is filed, regardless of later changes in originally crucial facts such as the parties' citizenship or the amount in controversy." (internal quotation marks omitted)).[6] Accordingly, Fridinger's Motion to Remand will be denied.

### B. Stonegate's Motion to Dismiss or Transfer

"Stonegate moves for dismissal of the Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure." (Docket Entry 8 at 1.) "When a court's personal jurisdiction is properly challenged by motion under Federal Rule of Civil Procedure 12(b)(2), the jurisdictional

---

[6] To avoid this conclusion, Fridinger attempts to rely on several cases from districts outside the Fourth Circuit and (in one instance) a federal appellate court other than the Fourth Circuit. (Docket Entry 14 at 5-6.) Such non-controlling authority cannot overcome the above-cited, plainly-applicable, controlling authority from the Fourth Circuit and Supreme Court. Moreover, as Stonegate has aptly demonstrated (see Docket Entry 23 at 6-7), the facts and circumstances of the cases cited by Fridinger render them devoid of even any persuasive value in the context of the present case.

question thereby raised is one for the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 59-60 (4th Cir. 1993). "[If] the district court decides a pretrial personal jurisdiction dismissal motion without an evidentiary hearing, the plaintiff need prove only a prima facie case of personal jurisdiction.  In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." Id. at 60 (internal citation omitted); see also Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989) ("If the existence of jurisdiction turns on disputed factual questions the court may resolve the challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.").

"[I]n order for a district court to validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied.  First, the exercise of jurisdiction must be authorized by the long-arm statute of the forum state, and, second, the exercise of personal jurisdiction must also comport with Fourteenth Amendment due process requirements." Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). "[I]t is apparent that the [North Carolina] General Assembly intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due

-12-

process." Dillon v. Numismatic Funding Corp., 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977). "Thus, the dual jurisdictional requirements collapse into a single inquiry as to whether the defendant has such minimal contacts with the forum state that maintenance of the suit does not offend traditional notions of fair play and substantial justice." Christian Sci. Bd., 259 F.3d at 215 (internal quotation marks omitted) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

A court may have personal jurisdiction over a defendant through either general or specific jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 nn.8-9 (1984)). "[I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State. To establish general jurisdiction over the defendant, the defendant's activities in the State must have been continuous and systematic, a more demanding standard than is necessary for establishing specific jurisdiction." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted). Specific jurisdiction exists when the "suit aris[es] out of or [is] related to the defendant's contacts with the forum . . . ." Helicopteros, 466 U.S. at 414 n.8. To determine the existence of specific jurisdiction, a court considers: "(1) the extent to which the defendant 'purposefully availed' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs'

-13-

claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" ALS Scan, 293 F.3d at 712.

As to the first of those three prongs, the Fourth Circuit has identified eight factors that it and the Supreme Court have considered "to resolve whether a defendant has engaged in such purposeful availment . . . [i]n the business context":

> [1] whether the defendant maintains offices or agents in the forum state, see McGee v. Int'l Life Ins. Co., 355 U.S. 220, 221 (1957);
>
> [2] whether the defendant owns property in the forum state, see Base Metal Trading, Ltd. v. OJSC, 283 F.3d 208, 213 (4th Cir. 2002);
>
> [3] whether the defendant reached into the forum state to solicit or initiate business, see McGee, 355 U.S. at 221; Burger King [Corp. v. Rudzewicz], 471 U.S. [462,] 475-76 [(1985)];
>
> [4] whether the defendant deliberately engaged in significant or long-term business activities in the forum state, see Burger King, 471 U.S. at 475-76, 481;
>
> [5] whether the parties contractually agreed that the law of the forum state would govern disputes, see Burger King, 471 U.S. at 481-82;
>
> [6] whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship, see Hirschkop & Grad, P.C. v. Robinson, 757 F.2d 1499, 1503 (4th Cir 1985);
>
> [7] the nature, quality and extent of the parties' communications about the business being transacted, see English & Smith [v. Metzger], 901 F.2d [36,] 39 [(4th Cir. 1990)]; and
>
> [8] whether the performance of contractual duties was to occur within the forum, see Peanut Corp. of Am. v. Hollywood Brands, Inc., 696 F.2d 311, 314 (4th Cir. 1982).

-14-

Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (internal parallel citation omitted). "If, and only if, [a court] find[s] that the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." Id.

Stonegate's brief supporting its instant Motion to Dismiss or Transfer denies the existence of both general and specific jurisdiction. (See Docket Entry 10 at 4-11.) Fairly read, Fridinger's response argues only that specific jurisdiction exists. (See Docket Entry 15 at 4-8.) Accordingly, the discussion that follows applies the record facts (in the light most favorable to Fridinger, see Mylan Labs., 2 F.3d at 60) to the eight factors identified by the Fourth Circuit as bearing upon the first (purposeful availment) prong of the specific jurisdiction test, see Consulting Eng'rs, 561 F.3d at 278.

### 1. Offices or Agents in North Carolina

The first purposeful availment factor concerns "whether [Stonegate] maintains offices or agents in [North Carolina]," id. at 278. Fridinger has averred that, during the events in question, Stonegate did not have an office in North Carolina, but that Stonegate does (or, at least at the relevant time, did) have representatives (including two other than him) in North Carolina. (Docket Entry 12 at 3 (¶ 7).) Although Stonegate has submitted evidence disputing that latter assertion (Docket Entry 21 at 3-4 (¶ 12)), given the current posture of the case, the Court must "resolve [such] factual disputes, in [Fridinger's] favor," Mylan

-15-

Labs., 2 F.3d at 60. Accordingly, this factor supports a finding that Fridinger has made a prima facie showing of purposeful availment by Stonegate.

2. Property Ownership in North Carolina

Pursuant to the second purposeful availment factor, the Court must consider "whether [Stonegate] owns property in [North Carolina]," Consulting Eng'rs, 561 F.3d at 278. According to Geraghty's affidavit, "[Stonegate] does not own any real property or other tangible assets in the State of North Carolina." (Docket Entry 9 at 2 (¶ 7).) Fridinger has not contested this point. (See Docket Entry 12.) This factor thus weighs against a conclusion that Stonegate meets the purposeful availment prong of the specific jurisdiction test.

3. Reaching into North Carolina to Initiate the Relationship

The third purposeful availment factor directs the Court's attention to the question of "whether [Stonegate] reached into [North Carolina] to solicit or initiate business [with Fridinger]," Consulting Eng'rs, 561 F.3d at 278. This factor carries particular significance because, in assessing the broader issue of purposeful availment, "the Fourth Circuit 'has given great weight to the question of who initiated the contact between the parties.'" Pan-American Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 682 (M.D.N.C. 2011) (Schroeder, J.) (emphasis added) (quoting Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV00906, 2006 WL 288422, at *5 (M.D.N.C. Feb. 6, 2006) (unpublished) (Tilley, C.J.) (citing Diamond Healthcare of Ohio,

-16-

Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 451 (4th Cir. 2000))); accord Power Beverage LLC v. Side Pocket Foods Co., C/A No. 06:12-931-TMC, 2013 WL 227875, at *5 (D.S.C. Jan. 22, 2013) (unpublished); Sloane v. Laliberte, No. 1:08CV381, 2011 WL 2938117, at *8 (M.D.N.C. July 19, 2011) (unpublished) (Auld, M.J.), recommendation adopted, slip op. (M.D.N.C. Sept. 15, 2011) (Eagles, J.); Waldron v. Atradius Collections, Inc., No. 1:10CV551, 2010 WL 2367392, at *3 (D. Md. June 9, 2010) (unpublished); Fatboy USA, LLC v. Schat, No. 1:07CV965, 2009 WL 3756947, at *5 (M.D.N.C. Nov. 6, 2009) (unpublished) (Dixon, M.J.), recommendation adopted, slip op. (M.D.N.C. Mar. 2, 2010) (Beaty, C.J.); Corporate Fleet Servs. v. West Van, Inc., No. 3:08-cv-00413-FDW, 2008 WL 4949129, at *3 n.1 (W.D.N.C. Nov. 17, 2008) (unpublished).  Here, that "great weight" favors Stonegate's position because (as documented in Section I.A.) the record reflects that Fridinger initiated the instant business relationship by contacting Geraghty outside North Carolina.

    4.  Significant/Long-term Activity in North Carolina

    "[A]n in-state plaintiff's contract with an out-of-state defendant cannot alone automatically establish sufficient minimum contacts to warrant jurisdiction."  Pan-American Prods., 825 F. Supp. 2d at 681 (citing Burger King, 471 U.S. at 478).  However, in connection with the fourth purposeful availment factor, the Court must assess "whether [Stonegate] deliberately engaged in significant or long-term business activities in [North Carolina]," Consulting Eng'rs, 561 F.3d at 278.  In this regard, "[t]he size of the contract is relevant in determining whether [Stonegate's]

-17-

actions directed toward [North Carolina] were sufficient to establish personal jurisdiction," Cambata Aviation, Inc. v. Kansas City Aviation Ctr., Inc., No. 5:01CV00062, 2001 WL 1274426, at *3 (W.D. Va. Oct. 22, 2001) (unpublished); accord Gateway Press, Inc. v. Leejay, Inc., 993 F. Supp. 578, 581 (W.D. Ky. 1997) (describing "size of the contract" at issue as "highly relevant factor[]" in assessment of "whether a defendant's actions directed toward the forum were sufficiently purposeful").

As detailed in Section II.A., the parties' instant agreement involved rather modest sums in the context of the commercial world. For example, in parallel contexts, courts have concluded that "[t]he fact that the contract between [an out-of-state defendant-corporation] and [the plaintiff-corporation] involved millions of dollars demonstrates that [the out-of-state defendant-corporation] had a substantial connection with [the plaintiff-corporation's home-state] . . . ." Cambata Aviation, 2001 WL 1274426, at *3; accord English Boiler & Tube, Inc. v. Glex Inc., No. 3:12CV88DJN, 2012 WL 2131895, at *6 (E.D. Va. June 12, 2012) (unpublished) (citing, as support for finding of purposeful availment, fact that "total cost of the contract [underlying the plaintiff's claim against an out-of-state defendant] exceeded one million dollars — indicating a substantial deal"). The undisputed evidence in this case (again, as documented in Section II.A.) establishes that the business transacted between Fridinger and Stonegate does not approach such a scale. Nor (as shown by the facts set forth in Section I.A.) did their commercial dealings span a lengthy period.

-18-

As a result, this factor weighs against the Court ruling that Stonegate engaged in purposeful availment.

### 5. Contractual Agreement that North Carolina Law Governs

For the fifth purposeful availment factor, the Court asks "whether the parties contractually agreed that the law of [North Carolina] would govern disputes," Consulting Eng'rs, 561 F.3d at 278. The Complaint acknowledges an absence of a meeting of the minds between the parties about what law would apply to their dealings. (See Docket Entry 3 at 2-3 (¶ 5).) This factor therefore disfavors a finding of purposeful availment by Stonegate.

### 6. In-person Contact in North Carolina

The sixth purposeful availment factor focuses on "whether [Stonegate] made in-person contact with [Fridinger] in [North Carolina] regarding the business relationship," Consulting Eng'rs, 561 F.3d at 278. As outlined in Section I.A., Stonegate has conceded that it did and, accordingly, this factor supports a finding that Fridinger can satisfy the purposeful availment prong of the specific jurisdiction test.

### 7. Communications between the Parties

"[T]he nature, quality and extent of the parties' communications about the business being transacted," Consulting Eng'rs, 561 F.3d at 278, constitutes the seventh purposeful availment factor. As an initial matter, Fridinger has not come forward with evidence that the parties had particularly extensive or otherwise substantial interactions (in-person, written, telephonic, or electronic) leading up to or in the execution of

-19-

their relatively brief working relationship. (See Docket Entry
12.) Moreover, as set forth in Section I.A., the uncontested facts
show that all in-person communications regarding contract formation
took place in New Jersey and, although Geraghty met with Fridinger
in North Carolina on one occasion during the life of the contract,
the bulk of the in-person communication Fridinger had with
Stonegate personnel occurred in New Jersey. Under these
circumstances, this factor indicates a lack of purposeful availment
on Stonegate's part.

### 8. Intended Performance in North Carolina

The eighth purposeful availment factor addresses "whether the
performance of contractual duties was to occur within [North
Carolina]," Consulting Eng'rs, 561 F.3d at 278. Because (as
detailed in Section I.A.) the parties have submitted conflicting
evidence on this subject and because (at this juncture) the Court
must "resolve [such] factual disputes, in [Fridinger's] favor,"
Mylan Labs., 2 F.3d at 60, the Court must place this factor on his
side of the purposeful availment ledger.

### 9. Summary and Weighing of Factors

The foregoing discussion demonstrates that, of the eight
factors the Fourth Circuit has recognized as relevant to a
determination regarding the purposeful availment prong of the
specific jurisdiction test, three (i.e., factors one, six, and
eight) favor a finding (at least at this stage of the proceedings)
that Stonegate purposely availed itself of the privilege of
conducting business in North Carolina and the remaining five (i.e.,

-20-

factors two, three, four, five, and seven) weigh against such a finding. More specifically, the record (when viewed in the light most favorable to Fridinger, see id.) reflects that, in support of a finding of purposeful availment, Stonegate "maintain[ed] . . . agents in [North Carolina], . . . made in-person contact with [Fridinger] in [North Carolina] regarding the business relationship, . . . [and, at least in part,] the performance of contractual duties was to occur within [North Carolina]," Consulting Eng'rs, 561 F.3d at 278. However, the uncontested facts also refute any finding that "[Stonegate] owns [or owned] property in [North Carolina], . . . [that Stonegate] reached into [North Carolina] to solicit or initiate business [with Fridinger], . . . [that Stonegate] deliberately engaged in significant or long-term business activities in [North Carolina], . . . [that] the parties contractually agreed that the law of [North Carolina] would govern disputes, . . . [and that] the nature, quality, and extent of the parties' communications about the business being transacted [was remarkable]," id. Moreover, not only do the majority of the recognized purposeful availment factors favor Stonegate, but also that majority includes the one factor (i.e., the initiation of the business relationship at issue) singled out by the Fourth Circuit as worthy of "great weight," Pan-American Prods., 825 F. Supp. 2d at 682. Given these considerations, the Court should conclude that Fridinger has failed to make a prima facie showing as to the purposeful availment prong of the specific jurisdiction test and should dismiss this case for lack of personal jurisdiction.

### III. CONCLUSION

The Court has diversity jurisdiction over this action; however, the record (viewed in the light most favorable to Fridinger) does not support the Court's exercise of personal jurisdiction over Stonegate.

**IT IS THEREFORE ORDERED** that Fridinger's Motion to Remand to the Superior Court of Guilford County (Docket Entry 13) is **DENIED.**

**IT IS RECOMMENDED** that Stonegate's Motion to Dismiss or Transfer (Docket Entry 8) be **GRANTED** with respect to the request for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2) and **DENIED AS MOOT** with respect to the alternative request for transfer pursuant to 28 U.S.C. 1404(a).

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

August 5, 2013